IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ERIC HARDIN,

                Plaintiff,

     v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

             Defendant.

Case No. 6:14-cv-01044-SB

**FINDINGS AND
RECOMMENDATION**

**BECKERMAN, Magistrate Judge.**

      Eric Hardin ("Hardin") appeals the Commissioner of Social Security's ("Commissioner")

final decision denying his application for Social Security disability insurance benefits under Title II

of the Social Security Act, 42 U.S.C. §§ 401-34. Specifically, Hardin asserts that the administrative

law judge ("ALJ") erred by finding Hardin not credible, by relying on the vocational expert's ("VE")

erroneous testimony to support a nondisability finding, and by failing to explain the evidentiary basis

for his residual functional capacity ("RFC") assessment. The Court has jurisdiction to hear this

Page 1 - FINDINGS AND RECOMMENDATION

appeal pursuant to 42 U.S.C. § 405(g). For the reasons that follow, the Court recommends that the district judge affirm the Commissioner's decision.

## I. FACTS AND PROCEDURAL HISTORY

Hardin stands six feet tall and weighs approximately 253 pounds. Hardin was born on July 17, 1988, and was twenty-three years old on November 24, 2011, the alleged disability onset date. In his application for disability insurance benefits, filed on October 1, 2012, Hardin claims that he is unable to work due to degenerative disc disease, posttraumatic stress disorder, anxiety, nerve damage, traumatic brain injury, and a hernia. Hardin served on active duty in the U.S. Army from October 2006 to February 2013. Although he received his normal military pay until February of 2013, Hardin claims that he has been unable to return to full-time work since undergoing back surgery in October 2011. Hardin has been receiving unemployment benefits since February 2013, and he was still receiving unemployment benefits at the time of his administrative hearing before the ALJ.

On October 11, 2011, roughly one month before his alleged disability onset date, Hardin presented for a preoperative visit with Dr. Andrew Schoenfeld ("Dr. Schoenfeld"), an orthopedic surgeon at the William Beaumont Army Medical Center ("the WBAMC") in El Paso, Texas. Dr. Schoenfeld noted that Hardin had experienced longstanding back pain and radicular symptoms in his left leg, which had "become fairly constant over the last year." (Tr. 829.) Dr. Schoenfeld added that his diagnostic impression was that Hardin was suffering from "back pain in the setting of lumbar spondylosis as well as radiculopathy in the setting of [L5-S1] disc herniation and a small subarticular disc herniation at [L3-L4]." (Tr. 831.) Dr. Schoenfeld informed Hardin that the L3-L4 disc herniation was not amenable to surgery due to its small size and subarticular nature, and "the fact that it [wa]s

not causing paresthetic or motor impaction in his left lower extremity[.]" (Tr. 831.) Dr. Schoenfeld agreed to proceed with a left-sided L5-S1 discectomy, hemilaminectomy, and foraminotomy, but informed Hardin that he would still likely need to receive a [Medical Evaluation Board] because the surgery was "not meant to impact [his] back pain nor [wa]s it intended to keep him on active duty."[1] (Tr. 831.)

Hardin underwent back surgery on October 24, 2011, and he presented for his first post-operative visit with Dr. Schoenfeld on November 15, 2011. Hardin reported that his motor function and sensation had improved, and that "his preoperative symptoms of left lower extremity radiculopathy had markedly resolved with no pain in his leg and even diminished symptoms into his anterior thigh that he had previously." (Tr. 813.) Hardin also informed Dr. Schoenfeld that he was no longer taking narcotic pain medications, and he would be "ready to return to work" the following week. (Tr. 813.) Dr. Schoenfeld issued a temporary medical profile change to facilitate Hardin's return to work, but reiterated that the degenerative changes in Hardin's spine were not impacted by the surgery and thus would likely result in an MEB (because Dr. Schoenfeld was of the opinion that Hardin could not "carry Army appropriate weight, move with a fighting load, [or tolerate improved outer tactical vests]"). (Tr. 813, 986.)

---

[1] The Army employs a three-tiered disability evaluation system, which consists of (1) a Medical Evaluation Board ("MEB") "to determine whether a soldier meets medical retention standards," (2) "an informal and then—if the soldier does not waive the right to one—a formal Physical Evaluation Board (PEB) to determine whether a soldier who does not meet medical retention standards is fit for duty and, in the event that the soldier is found not fit for duty, to determine the soldier's disability rating," and, "in certain situations, (3) additional review by the U.S. Army Physical Disability Agency." *Watson v. United States*, 113 Fed. Cl. 615, 620 (Fed. Cl. 2013) (citation omitted).

Hardin presented for his second post-operative visit with Dr. Schoenfeld on December 14, 2011. Hardin reported "some increase in his midback pain" since returning to work, but denied "any substantial low back pain." (Tr. 807.) Hardin also noted that "his preoperative symptoms in the lower extremity from [L5-S1] that were relieved in the immediate postoperative period ha[d] remained gone." (Tr. 807.) Dr. Schoenfeld gave Hardin a Vicodin prescription to control his midback pain, and informed Hardin that he could begin "matriculating to increased activity and heavier weights." (Tr. 808.)

On January 31, 2012, Dr. Jane Nicholson ("Dr. Nicholson"), a psychologist at the WBAMC, completed a psychiatric retention evaluation. Dr. Nicholson noted that Hardin began prolonged treatment with the Behavioral Health Department in late June 2009, after returning from his deployment to Afghanistan. During the course of his treatment, Hardin reported symptoms of low frustration tolerance, difficulty concentrating and completing tasks, and extreme forgetfulness. He also reported hearing sounds (e.g., a rocket coming into his barracks) and "seeing a dead friend everywhere." (Tr. 792.) Based on her review of Hardin's records, a clinical interview, and psychological testing, Dr. Nicholson concluded that Hardin was not fit for duty from a behavioral health perspective, and thus referred Hardin to an MEB. Dr. Nicholson's diagnoses included: chronic posttraumatic stress disorder (Axis I), occupational stressors (Axis IV), and a Global Assessment of Functioning ("GAF") score of 51 to 60.[2]

---

[2] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F .3d 1161, 1164 n. 2 (9th Cir. 1998). "A GAF of 50–60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers).'" *Vandermark v. Colvin*, No. 3:13-cv-1467, 2015 WL 1097391, at *5 n.7 (W.D.N.Y. Mar. 11, 2015) (citation omitted).

On July 1, 2012, Dr. Jonathan Kim ("Dr. Kim") examined Hardin at the WBAMC. Hardin informed Dr. Kim that "his biggest problem[s] [w]ere anger and anxiety." (Tr. 772.) Dr. Kim's diagnostic impressions included: anxiety not otherwise specified (Axis I),[3] migraines and back pain (Axis III); routine military stressors (Axis IV); and a GAF score of 55.[4] Dr. Kim noted that Hardin could not be deployed for ninety days based in part on an upcoming MEB for his back, but also noted that Hardin met the "retention standards [in accordance with] AR 40-501 CH. 3-33 for psychiatric condition."[5] (Tr. 773.)

On September 18, 2012, Hardin presented for a medication management follow-up visit with Glenda Wolfe ("Wolfe"), a board certified psychiatric mental health nurse practitioner at the WBAMC.[6] Hardin reported that he had been attending anger management and anxiety groups, and that he "meditates and works out" to alleviate his anger problems. (Tr. 878.) A mental status

---

[3] "When several core features of a particular diagnosis present themselves, but individual characteristics do not give rise to any one subcategory, a description of 'NOS,' meaning 'Not Otherwise Specified,' is given. A diagnosis followed by 'NOS' does not put the principal diagnosis in doubt." *Slaten v. Comm'r of Soc. Sec. Admin.*, No. 06–1660, 2008 WL 4192282, at *4 n.12 (D.N.J. Sept. 9, 2008) (citation omitted).

[4] A GAF score of 55 indicates that the individual experiences moderate difficulty in social, occupational, or school functioning. *Melton v. Comm'r of Soc. Sec. Admin.*, 442 F. App'x 339, 341 (9th Cir. 2011).

[5] "Army Regulation (AR) 40-501, Chapter 3 sets standards which the Army is to apply on questions of medical discharge." *Taylor v. Chafitz*, 461 F.2d 621, 623 (3d Cir. 1972). "Active duty Soldiers who do not meet the medical retention standards in chapter 3 of this regulation must be referred to an MEB/PEB for a fitness-for-duty determination." Army Reg. 40-501 ¶ 5-14(c); *see also Watson*, 113 Fed. Cl. at 621 (citing a version of AR 40-501 in effect in October 2006 for the same proposition).

[6] Psychiatric mental health nurse practitioners are not considered "acceptable medical sources" under the Social Security regulations. *Espenas v. Colvin*, No. 3:14-cv-00355-HZ, 2014 WL 7405655, at *7 (D. Or. Dec. 30, 2014).

examination revealed that Hardin displayed average intelligence with "[c]ognition grossly intact," "[c]oncentration intact to conversation," and thought processes that "were clear, logical, and goal-directed without loosening of associations or flight of ideas." (Tr. 879.) Wolfe's diagnostic impressions included anxiety not otherwise specified (Axis I), migraines and back pain (Axis III), routine military stressors and partner relational stressors (Axis IV), and a GAF score of 55.

On December 17, 2012, the Disability Determination Services referred Hardin to Dr. Onyema Amakiri ("Dr. Amakiri") for a consultative examination.[7] Hardin's chief complaints concerned degenerative disc disease, nerve damage, a hernia, and a traumatic brain injury. Despite rating his back pain as a nine on a ten-point scale, Hardin admitted that he exercises regularly. Upon physical examination, Dr. Amakiri found Hardin's movement to be normal, noting, among other things, that Hardin was able to "hop without difficulty" and "squat without difficulty." (Tr. 1076.) Based upon his examination and a review of Hardin's medical records, Dr. Amakiri concluded that Hardin "has no limitations with speaking, hearing, handling objects, carrying, lifting, moving about, standing and lifting." (Tr. 1077.)

On March 10, 2013, Hardin visited the emergency room at the Veterans Affairs Medical Center in Los Angeles, California. Hardin complained of recent "pain on the left mid to lower back with intermittent shooting pain that travel[ed] up his back and down his left leg." (Tr. 1069.)

---

[7] A doctor of osteopathic medicine, such as Dr. Amakiri, is an acceptable medical source under the Social Security regulations. *See Gonzales v. Colvin*, No. 13–1421, 2014 WL 4656470, at *3 n.3 (C.D. Cal. Sept. 17, 2014). "Osteopathy adheres to the principle that a patient's history of illness and physical trauma are written into the body's structure. Osteopathic physicians therefore complete additional training in the study of hands-on manual medicine and the body's musculoskeletal system to permit them to feel (palpitate) the patient's living anatomy (the flow of fluids, motion and texture of tissues, and structural makeup)." *Id.* (internal citation and quotation marks omitted).

Treatment records indicate that Hardin's recent onset of back pain was likely due to exacerbation. Hardin was given a Vicodin prescription and instructed to follow up with his primary care provider for re-evaluation.

The ALJ convened a video hearing on November 21, 2013, at which Hardin testified about the limitations resulting from his impairments. Hardin testified that he was medically discharged from the Army on February 10, 2013, with an eighty percent disability rating from the Department of Veterans Affairs ("the VA").[8] Hardin confirmed that he had been receiving unemployment benefits since February 2013. Hardin estimated that, on his very best days, he could lift twenty to thirty pounds, stand continuously for up to ten minutes, walk continuously for four or five blocks, and sit continuously for up to thirty minutes. Hardin cited back problems and a bad temper as the limitations that most significantly interfere with his ability to perform substantial gainful activity. Hardin confirmed that he has not received any further treatment of his back or traumatic brain injury since being discharged from the Army, but he continues to take Adderall for attention deficit hyperactivity disorder.

Hardin also testified that his impairments interfere with his ability to deal with large groups of people, count change, pay bills, cook meals, perform household chores, maintain focus, and cope

---

[8] Hardin's counsel, who attended the hearing by video, represented that he had copies of the VA disability award letter and rating decision "here today," and that he would provide those records to the ALJ since they were never made part of the record. (Tr. 31, 37, 40, 69-72.) Despite these representations, Hardin's counsel never followed up on the ALJ's request: "During the hearing, the undersigned [ALJ] requested that the claimant's attorney submit the VA disability award letter and VA rating decision letter. [Hardin and his counsel] reportedly had these in hand [during the video hearing,] showing that the claimant had an [eighty percent] disability rating from the VA. In the several months since the hearing, no such documents ha[ve] been submitted. The medical record also apparently does not include a VA compensation and pension examination as would be expected[.]" (Tr. 18.)

with bright lights. Hardin stated that he is currently living with his mother and uncle, holds a valid medical marijuana card and uses the drug on a daily basis, and is in the process of finalizing a divorce. Hardin cited his impending divorce as one of the reasons he applied for unemployment benefits:

> Q. To apply for [u]nemployment [c]ompensation, you have to swear under oath that you're ready, willing, and able to work. [But] [y]ou just can't find a job.
>
> A. For the time being, that's -- I have been willing to work, but I just can't.
>
> Q. Well, you're on the record with two different . . . [g]overnment [a]gencies saying exactly opposite things about the same period of time, and my question is how do you explain that contradiction?
>
> A. I was trying to find a job. I was having trouble with money, sir, and I needed the unemployment to start paying off bills, getting ready to pay money towards my wife, towards a divorce.

(Tr. 51.)

The ALJ and Hardin's attorney posed a series of questions to a VE who testified at Hardin's hearing. The ALJ first asked the VE to assume that a hypothetical worker of Hardin's age, education, and vocational background (e.g., an artillery gunfire observer) could (1) lift and carry twenty-five pounds frequently and fifty pounds occasionally, (2) sit for up to six hours in an eight-hour workday, (3) stand and/or walk for a combined six hours during an eight-hour workday, (4) push and pull in a manner consistent with the lift and carry restrictions, (5) frequently kneel, (6) occasionally climb ladders, ropes, and scaffolds, and (7) climb ramps and stairs, balance, stoop, crouch, and crawl without limitation. The VE testified that the hypothetical worker could be employed as a hand packer (DOT 920.587-018), small products assembler II (DOT 739.687-030), and garment sorter (DOT 22.687-014). The VE further testified that there were 166,945 hand packager jobs in the national

economy, including 1,714 jobs in Oregon, 186,634 small products assembler II jobs in the national economy, including 3,987 jobs in Oregon, and 131, 201 garment sorter jobs, including 1,615 jobs in Oregon.

The ALJ next asked the VE to assume that the hypothetical worker described above (1) could lift and carry ten pounds frequently and twenty pounds occasionally, (2) needed to be allowed to alternate between sitting and standing every thirty minutes, (3) could occasionally operate foot controls with the left lower extremities, (4) could occasionally perform overhead push-pull activities and overhead reaching with the bilateral upper extremities; (5) could not crawl or climb ladders, ropes, and scaffolds, (6) could occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, (6) needed to avoid concentrated exposure to workplace hazards, in particular unprotected heights and unguarded machinery, (7) was able to perform unskilled work with a specific vocational preparation level of one or two, (8) needed to be limited to work that only involved simple, job-related decision-making, "few if any workplace changes," and no more than occasional interaction with co-workers and the general public, and (9) could not perform work that involved travel across uneven terrain or the operation of a vehicle. (Tr. 67.) The VE testified that the hypothetical worker could be employed as a small products assembler II, electronics worker (DOT 726.687-010), and bottling line attendant (DOT 920.687-042). The VE stated that there were 186,634 small products assembler II jobs in the national economy, including 3,987 jobs in Oregon, 227,477 electronics worker jobs in the national economy, including 3,515 jobs in Oregon, and 150,000 bottling line attendant jobs in the national economy, including 1,500 jobs in Oregon.[9] In response to the only

---

[9] The ALJ relied on this second hypothetical, and the VE's response thereto, in finding Hardin not disabled.

question posed by Hardin's counsel, the VA added that the customary tolerance for lost production time in a given workday was about ten percent.

In a written decision issued on February 28, 2014, the ALJ applied the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a)(4), and found that Hardin was not disabled. *See infra* Part II.A-B. The Social Security Administration Appeals Council denied Hardin's petition for review, making the ALJ's decision the Commissioner's final decision. Hardin timely appealed to the federal court.

## II. THE FIVE-STEP SEQUENTIAL PROCESS

### A.    Legal Standard

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

Page 10 - FINDINGS AND RECOMMENDATION

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show that the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

**B.    The ALJ's Decision**

At the first step of the five-step process, the ALJ found that Hardin had not engaged in substantial gainful activity since November 24, 2011, the alleged disability onset date. At the second step, the ALJ found that Hardin had medically determinable severe impairments consisting of: degenerative disc disease of the lumbar spine, status post discectomy; history of traumatic brain injury; migraines; left hip trochanteric bursitis; status post closed stress fracture left fibula; obesity; depression/adjustment disorder; anxiety disorder; posttraumatic stress disorder; and attention deficit hyperactivity disorder.

At the third step, the ALJ found that Hardin's combination of impairments was not the equivalent of those on the Listing of Impairments. The ALJ then assessed Hardin's RFC and found that he could lift and carry twenty pounds occasionally and ten pounds frequently; sit for up to six hours in an eight-hour workday; stand and/or walk for a combined six hours during an eight-hour workday, assuming he is allowed to alternate between sitting and standing every thirty minutes; occasionally perform overhead push-pull activities and overhead reaching with the bilateral upper extremities; occasionally operate foot controls with the left lower extremity; and occasionally balance, stoop, kneel, crawl, and climb ramps and stairs. The ALJ also found that Hardin was not

capable of crawling or climbing ladders, ropes, or scaffolds; should avoid concentrated exposure to workplace hazards, such as unprotected heights and unguarded moving machinery, and was limited to unskilled work with a specific vocational preparation of one or two that involved simple job-related decision-making, "few if any workplace changes," no more than occasional interaction with co-workers and the general public, and that did not require travel across uneven terrain or the operation of a vehicle. (Tr. 17.)

At the fourth step, the ALJ concluded that Hardin was not capable of performing any past relevant work. At the fifth step, the ALJ found that there were other jobs existing in significant numbers in the national economy that Hardin could perform, such as a small products assembler II (DOT 739.687-030), an electronics worker (DOT 726.687-010), and a bottling line attendant (DOT 920.687-042). The ALJ therefore concluded that Hardin was not disabled within the meaning of the Social Security Act.

### III. STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record,

weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## IV. DISCUSSION

In this appeal, Hardin asserts that the ALJ erred by (1) rejecting his subjective symptom testimony, (2) relying on the VE's erroneous testimony to support a nondisability finding, and (3) failing to explain the evidentiary basis for his RFC assessment. This Court, as explained below, finds that the ALJ provided clear and convincing reasons for rejecting Hardin's symptom testimony, did not rely on erroneous testimony from the VE to support a nondisability finding, and explained adequately the evidentiary basis for the RFC assessment. Accordingly, the Court recommends that the district judge affirm the Commissioner's decision on the ground that it is supported by substantial evidence.

## A.    The ALJ did not Err in Rejecting Hardin's Symptom Testimony

### 1.    Applicable Law

In the Ninth Circuit, absent an express finding of malingering, an ALJ must provide specific, clear, and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted). Clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the alleged symptoms, and testimony from physicians and third parties about the nature, severity and effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11–cv–583–SI, 2012 WL 2401642, at *9 (D. Or. June 25, 2012); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

In assessing a claimant's credibility, an ALJ may also consider (1) "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid," and (2) "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment[.]" *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). If the ALJ's credibility finding is supported by substantial evidence in the record, district courts may not engage in second-guessing. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citing *Morgan*, 169 F.3d at 600).

### 2.    Application of Law to Fact

Hardin argues that the ALJ erred by finding him not credible because his receipt of unemployment benefits was inconsistent with his claim for disability insurance benefits, and by "failing to solicit information from Hardin regarding the potential occupations for which he applied

when receiving unemployment benefits," such as the lifting requirements and whether it was full-time or part-time work. (Pl.'s Br. at 18.) Citing these alleged errors, Hardin claims that, because the "primary basis" for finding his testimony incredible was legally erroneous, the ALJ's adverse credibility determination is not supported by substantial evidence. (Pl.'s Br. at 19.) The Court disagrees.

The receipt of unemployment benefits in Oregon is not necessarily inconsistent with the filing of an application for disability benefits under the Social Security Act. *See Mulanax v. Comm'r of Soc. Sec.*, 293 F. App'x 522, 523 (9th Cir. 2008) ("[I]n order to be eligible for disability benefits under the Social Security Act, the person must be unable to sustain full-time work[.] . . . However, under Oregon law, a person is eligible for unemployment benefits if she is available for some work, including temporary and part time opportunities. Therefore, Mulanax's claim of unemployment in Oregon is not necessarily inconsistent with her claim of disability benefits under the Social Security Act."). Contrary to Hardin's suggestion, however, the ALJ did not assume that his receipt of unemployment benefits was based on an availability to perform full-time work, and in turn conclude that Hardin's claim of unemployment was inconsistent with his claim of disability benefits. Rather, the ALJ noted that it was inconsistent for Hardin to represent to the State of Oregon that he was capable of working in any capacity, while also representing to the ALJ that "he is willing to work but cannot."[10] (Tr. 18.) As the ALJ explained, the latter "assertion conflicts with the 'able' portion of what [Hardin] affirmed in order to get [employment] benefits." (Tr. 18.) The ALJ did not need

---

[10] During the administrative hearing, Hardin informed the ALJ that he has "been willing to work, but [he] just can't." (Tr. 51.) After the ALJ noted that Hardin's claimed inability to perform any work was inconsistent with his representations to the State of Oregon, the only explanation Hardin could provide was that he needed money to pay for an impending divorce and outstanding bills. (Tr. 51.)

to solicit further information from Hardin in order to find his testimony inconsistent on this ground. In light of the foregoing, the Court concludes that *Mulanax* and similar cases are inapposite, and accordingly rejects Hardin's argument that the ALJ's credibility determination was erroneous.

In any event, even if the ALJ erred by determining that Hardin's representations to the unemployment office were inconsistent with his hearing testimony (and this Court concludes the ALJ did not so err), any error was harmless because the ALJ provided several other clear and convincing reasons for rejecting Hardin's testimony. For example, the ALJ supported his conclusion that Hardin was not credible on the ground that Hardin's allegations were undermined by other medical evidence in the record: "No treating or examining physician, psychiatrist, or psychologist has stated the opinion that the claimant is totally and permanently disabled." (Tr. 19.) Substantial evidence in the record supports that finding, including: (1) Dr. Amakiri's opinion that Hardin has no limitations with speaking, hearing, handling objects, carrying, lifting, moving about, standing, and lifting; (2) Dr. Schoenfeld's opinion that Hardin could begin advancing to increased activity and heavier weights, just two months after he underwent back surgery; and (3) the opinions of the non-examining state agency medical consultants who reviewed the medical records and concluded that Hardin is not disabled. (Tr. 81, 93, 808, 1077.)

Furthermore, the ALJ supported his conclusion that Hardin was not credible on the additional grounds that Hardin's allegations were undermined by his unexplained or inadequately explained failure to seek treatment for physical and mental impairments, despite having the means to do so (e.g., Hardin reports that he is receiving medical benefits, and has been accepting unemployment benefits), and inconsistent testimony regarding whether he ever returned to work following his back surgery. (*See* Tr. 19-20, 34, 58, 807.) The ALJ also relied on ordinary techniques of credibility

Page 16 - FINDINGS AND RECOMMENDATION

evaluation, noting that Hardin and his counsel claimed to be in possession of the VA disability award letter and rating decision during the video hearing, yet they failed to provide copies of these documents to the ALJ. (Tr. 18.)

In summary, the Court concludes that the ALJ did not err by discrediting Hardin's testimony on the ground that his representations to the state unemployment office were inconsistent with his hearing testimony. Even if the ALJ did err in this regard, however, the other valid reasons the ALJ provided for discounting Hardin's testimony renders any error harmless. *Cf. Card v. Colvin*, No. 13-1200, 2014 WL 989251, at *4 (W.D. Wash. Mar. 12, 2014) ("Ms. Card's failure to challenge all of the reasons provided by the ALJ for discounting her credibility renders any errors at most harmless." (citing *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008))).

## B.     The ALJ did not Rely on Erroneous VE Testimony

Hardin also argues that the ALJ erred by relying on erroneous testimony from the VE to support nondisability. Specifically, Hardin argues that the bottling line attendant, small products assembler II, and electronics worker jobs that the VE testified he could perform are inconsistent with his limitation to occasional bilateral overhead reaching, and his need to avoid concentrated exposure to workplace hazards such as moving machinery. Again, the Court disagrees.

In *Fenton v. Colvin*, No. 6:14-cv-00350-SI, 2015 WL 3464072 (D. Or. June 1, 2015), the district court was confronted with a similar argument regarding an apparent conflict between the claimant's RFC and the VE's testimony. In that case, the claimant argued the addresser job that the VE testified she could perform was inconsistent with her limitation to occasional bilateral overhead reaching. *Id.* at *2. In rejecting the claimant's argument, the district court began by noting that the addresser job required frequent "reaching," which the Social Security Rulings define as "extending

the hands and arms in any direction." *Id*. (citations omitted). The district court then reviewed the description of the addresser job, which did not appear to require the performance of any tasks that involved overhead reaching, and concluded that it was reasonable for the VE to determine that the addresser job did not require frequent bilateral overhead reaching (i.e., more than occasional bilateral overhead reaching). *Id*. Even if that were not the case, however, the district court concluded that the VE explained adequately any inconsistency between her testimony and the Dictionary of Occupation Title's ("DOT") description of the addresser job, by testifying that she relied on, among other things, her years of experience, application in the field, job analyses, and understanding of the workplace. *Id*.

In the present case, the bottling line attendant job does require frequent "reaching," which is defined as "extending the hands and arms in any direction." SSR 85-15, *available at* 1985 WL 56857, at *7; Bottling Line Attendant, *DOT* § 920.687-042, *available at* 1991 WL 687971. The job description for a bottling line attendant indicates that the worker prepares bottles for shipping and packaging by performing a combination of the following activities: pasting tax stamps and labels on bottles as they pass by on a conveyor belt, examining the bottles to ensure that the stamps and labels have been correctly applied, straightening the stamps and labels on the bottles, pressing stamps on the backs of bottles, wiping excess moisture and glue from bottles, packing bottles into cartons, and pasting identification labels on cartons. *Id*. The job description also states: "Moving Mech. Parts: Not Present - Activity or condition does not exist . . . High Exposed Places: Not Present - Activity or condition does not exist." *Id*.

Hardin argues that the bottling attendant job is inconsistent with his limitation to occasional bilateral overhead reaching. Based on a review of the job description, however, it was reasonable for

the VE to conclude that the bottling line attendant job did not require more than occasional bilateral overhead reaching; in fact, it appears only to require reaching forward at or near waist level. *See Fenton*, 2015 WL 3464072, at *2 ("The job description for Addresser is 'Addresses by hand or typewriter, envelopes, cards, advertising literature, packages, and similar items for mailing. May sort mail.' While this position requires frequent 'reaching,' it was reasonable for the VE to conclude that it does not require frequent 'bilateral overhead reaching.'").

Hardin also suggests that the bottling attendant job is inconsistent with his need to avoid concentrated exposure to workplace hazards: "[All three] jobs require working directly with moving machinery and hazards, as defined by the DOT, in direct violation of the ALJ's hypothetical." (Pl.'s Br. at 8.) The Social Security Rulings define "hazards" as "moving mechanical parts of equipment, tools, or machinery; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals." SSR 96-6p, *available at* 1996 WL 374185, at *9. In other words, the presence of moving mechanical parts of equipments, tools, or machinery constitutes a workplace "hazard." Although the bottling line attendant position requires working near a conveyor belt, the job description indicates that moving mechanical parts are not present in this position. In light of the foregoing, the Court concludes that the VE's testimony did not conflict with the DOT.

Furthermore, the hearing transcript makes clear that the VE was not merely relying on the DOT when he testified that Hardin could perform the position of bottling line attendant. The ALJ asked the VE whether his testimony was "generally" in accordance with the DOT, and the VE answered in the affirmative. (Tr. 68.) However, the ALJ then attempted to "corral . . . up" a number of hypothetical limitations that were discussed during the hearing (e.g., sit-stand option, limitations

Page 19 - FINDINGS AND RECOMMENDATION

concerning "upper extremities, overhead reaching sort of thing versus regular reaching," the need to operate a motor vehicle, etc.), and asked the VE whether his testimony on these subjects was based on the DOT. (Tr. 68-69.) The VE confirmed that his testimony was "based on [his] 34 years of experience analyzing jobs, going out to job sites, and being familiar with those jobs and what the numbers are [and what] the reductions would be [in light of certain hypothetical limitations]." (Tr. 69.) The VE's testimony, knowledge, and experience, coupled with the observations regarding the job description for the bottling line attendant position, provide sufficient evidence to supplement the DOT. *See Fenton*, 2015 WL 3464072, at *2 (making a similar observation); *see also* Transcript at 61, *Fenton v. Colvin*, No. 6:14-cv-00350-SI (D. Or. filed August 5, 2014), ECF No. 8 ("Ms. Wise, have all these things [we discussed] today been consistent with the DOT and if not, could you please identify upon what you rely? A. Yes, Your Honor, DOT, Occupational Outlook handbook, the ONET, years of experience, application in the field, and job analyses, and understanding the workplace.").

In sum, the Court rejects Hardin's challenges to the VE's testimony regarding the bottling line attendant job, on which the ALJ appropriately relied at step five. The Court does not address Hardin's challenges to the VE's testimony regarding the small products assembler II and electronics worker jobs because "[t]he Commissioner's burden is satisfied by showing the existence of only one job with a significant number of available positions that the claimant can perform." *Ratliff v. Colvin*, N. 3:12-cv-02326-HU, 2014 WL 1269505, at *5 (D. Or. Mar. 26, 2014) (citation and ellipses omitted).

Page 20 - FINDINGS AND RECOMMENDATION

**C.     The ALJ did not Err in Formulating the RFC**

**1.     Social Security Ruling 96-8p**

Hardin challenges the ALJ's RFC assessment, claiming that the ALJ failed to comply with Social Security Ruling 96-8p ("SSR 96-8p"). SSR 96-8p provides that an "RFC assessment must include a narrative discussion describing how the [record] evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, *available at* 1996 WL 374184, at *7. SSR 96-8p also provides: "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id*.

Hardin argues that the ALJ violated SSR 96-8p by failing "to base the RFC upon any medical evidence," or "specify what medical evidence he relied on when forming the RFC and how that evidence supported the limitations included in the RFC." (Pl.'s Br. at 12, 14.) However, "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012); *see also Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (rejecting the claimant's argument that the RFC finding lacked support from medical sources in the record, and holding that "[a]lthough the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh *all of the evidence* available to make an RFC finding that was consistent with the record as a whole") (emphasis added).

Hardin's argument regarding the ALJ's alleged failure to comply with SSR 96-9p is also premised on a number of inaccurate factual assertions. First, Hardin claims that, in formulating the

Page 21 - FINDINGS AND RECOMMENDATION

RFC, the ALJ afforded "weight to no medical opinion of record." (Pl.'s Br. at 10.) However, the ALJ did afford "some weight" to the state agency medical consultants. (Tr. 20, 22.)

Second, Hardin asserts that "[n]o evidence" supports the ALJ's conclusion that Hardin can perform a modified version of light work that includes occasional overhead reaching and occasional operation of foot controls with the lower left extremities, or "any other capacities found by the ALJ, as opposed to being restricted further." (Pl.'s Br. at 11.) However, the opinions of Dr. Amakiri and the state agency medical consultants (medical doctors and psychologists) support a *less* restrictive RFC than that which the ALJ formulated, as discussed below. (*See* Tr. 17, 20-22, 73-82, 84-94, 1075-77.)

The ALJ assessed Hardin's RFC, and found that he could lift and carry twenty pounds occasionally and ten pounds frequently; sit for up to six hours in an eight-hour workday; stand and/or walk for a combined six hours during an eight-hour workday, assuming he is allowed to alternate between sitting and standing every thirty minutes; occasionally perform overhead push-pull activities and overhead reaching with the bilateral upper extremities; occasionally operate foot controls with the left lower extremity; and occasionally balance, stoop, kneel, crawl, and climb ramps and stairs. The ALJ also found that Hardin was not capable of crawling or climbing ladders, ropes, or scaffolds; should avoid concentrated exposure to workplace hazards, such as unprotected heights and unguarded moving machinery, and was limited to unskilled work with a specific vocational preparation of one or two that involved simple job-related decision-making, "few if any workplace changes," no more than occasional interaction with co-workers and the general public, and that did not require travel across uneven terrain or the operation of a vehicle. (Tr. 17.)

Page 22 - FINDINGS AND RECOMMENDATION

By comparison, at least one state agency medical consultant found that Hardin (1) could lift and carry fifty pounds occasionally and twenty-five pounds frequently; (2) could sit for up to six hours in an eight-hour workday with normal breaks; (3) could stand and/or walk for up to six hours in an eight-hour workday with normal breaks (i.e., no mention of a need for a sit-stand option); (4) could push and/or pull in accordance with an ability to lift and carry fifty pounds occasionally and twenty-five pounds frequently (i.e., no mention of a need to be limited to occasional overhead push-pull activities, overhead reaching with the bilateral upper extremities, or operation of foot controls with the left lower extremity); (5) had no postural limitations (climbing ramps, stairs, ladders, ropes, and scaffolds, balancing, stooping, kneeling, crouching, and crawling), or manipulative, visual, communicative, or environmental limitations (i.e., travel across uneven terrain, operation of a motor vehicle, or exposure to workplace hazards); (6) need not be limited to unskilled work; (7) was only moderately limited in his ability to get along with co-workers and interact appropriately with the general public; and (7) can "understand, remember, and carry out complex instructions, make important decisions, attend and concentrate for extended periods, interact with others, accept instructions and respond to changes in a routine work setting." (Tr. 77-78, 79-81, 91-92, 93.) Similarly, Dr. Amakiri found that Hardin had "no limitations with . . . carrying, lifting, moving about, standing and sitting." (Tr. 1077.)

Accordingly, Hardin's argument fails because substantial evidence supports the ALJ's RFC, and in fact supports an even less restrictive RFC than that which the ALJ formulated. *See Hopper v. Colvin*, No. 6:13-cv-01525-HZ, 2014 WL 6473566, at *4 (D. Or. Nov. 14, 2014) ("Mr. Hopper's claim fails because, even assuming that the ALJ did adopt limitations on [his] RFC beyond those that the medical evidence supported, this would only serve to benefit [Hardin].").

Third, and finally, Hardin claims that "no evidence" supports the ALJ's determination that he needs to rotate between sitting and standing positions every thirty minutes, "as opposed to more frequent levels." (Pl.'s Br. at 11.) Yet, there is medical evidence in the record that suggests Hardin did not require *any* sit-stand option. For example, Dr. Amakiri opined that Hardin had no limitations moving about, standing, and sitting, and the state agency medical consultants opined that Hardin could sit, stand, and walk for up to six hours in an eight-hour workday. (Tr. 78, 91, 1077.) As in *Hopper*, here the ALJ adopted limitations beyond those that the medical evidence supported, and therefore Hardin's argument fails. However, the Court further notes that, in finding that Hardin needed to rotate between a sitting and standing position every thirty minutes for comfort, the ALJ relied on Hardin's hearing testimony regarding the extent of his functional limitations on his "best day." (Tr. 21, 42, providing the ALJ an estimate on Hardin's need to rotate between a sitting and standing position on days when his physical limitations were the least severe.) Hardin's claim that the "ALJ provided no explanation as to his formulation of the frequency levels for alternating between sitting and standing, so as to allow this Court an observable measurement to discern how this part of the RFC was reached, or where it originated," is therefore erroneous. (Pl.'s Br. at 11.)

In sum, the Court is satisfied that the ALJ's RFC assessment complies with the requirements of SSR 96-8p.

## 2.    SSR 96-9p

Hardin also argues that the ALJ's RFC assessment did not comply with SSR 96-9p. SSR 96-9p provides, in relevant part:

> An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a

full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work.

SSR 96-9p, *available at* 1996 WL 374185, at *7. Citing this excerpt, Hardin maintains that "the frequency of alternating, and the length of time needed to stand, may be the primary difference between finding [him] disabled or not, yet the ALJ's conclusion regarding the sit-stand option is undefined." (Pl.'s Br. at 13.)

Hardin's argument lacks merit. The ALJ's RFC assessment specified the frequency of the need to alternate between sitting and standing, and the length of time Hardin needed to stand: Hardin is capable of standing "for up to six hours during an eight-hour workday, with normal breaks," but he also needs to be able to rotate between a sitting and standing position "every 30 minutes [to maintain] comfort throughout the workday." (Tr. 17, 21, 66.) The VE considered these limitations when responding to the ALJ's hypothetical, and concluded that Hardin could perform the jobs of small products assembler II, electronics worker, and bottling line attendant. (Tr. 67.) Citing his years of experience and studies, the VE also reduced the number of available bottling line attendant jobs in the regional and national economy from 3,000 to 1,500 and 300,000 to 150,000, respectively, based on the nature of the sit-stand option described by the ALJ. (Tr. 67.) Accordingly, the RFC complied with SSR 96-9p.

### 3.    Dr. Nicholson's Opinion

Finally, Hardin argues that the ALJ's RFC determination is defective because it fails to account for Dr. Nicholson's opinion that Hardin would experience an "occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-case, and conversation normal)[.]" (Tr. 794; Pl.'s Br. at 14.) Hardin claims that this alleged omission was significant because the VE confirmed that the customary tolerance for lost production time in a given workday is about ten percent. (Tr. 68; Pl.'s Br. at 14-15.)

Hardin's argument is unavailing. In his written decision, the ALJ quoted the relevant portion of Dr. Nicholson's report. (Tr. 21.) After noting that Dr. Nicholson referred to an intermittent inability to perform occupational tasks associated with Hardin's military duties, the ALJ observed that although Dr. Nicholson did not provide "specific functional limitations," she did provide a GAF score that was indicative of moderate difficulty in occupational functioning. The ALJ also noted that the GAF score that Dr. Nicholson assigned "was consistent with other care providers' assessments." (Tr. 22.) The ALJ carefully considered Dr. Nicholson's opinion, and concluded that Dr. Nicholson's reference to an intermittent inability to perform occupational tasks was accommodated by the ALJ's RFC assessment. (Tr. 21-22; *see also* Tr.17, limiting Hardin to unskilled work with an SVP of one or two that involves only simple, job-related decision-making, and no more than occasional interaction with the general public and co-workers). In any event, Dr. Nicholson never opined that Hardin's lost production time would exceed ten percent. *See Andrews*, 53 F.3d at 1039 ("The ALJ is responsible for . . . resolving conflicts in medical testimony, and for resolving [any] ambiguities."). For all of these reasons, the RFC adequately incorporates Dr. Nicholson's opinion.

## V. CONCLUSION

Based on the foregoing reasons, the Court recommends that the district judge affirm the Commissioner's decision.

## VI. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 4th day of November, 2015.

_____
STACIE F. BECKERMAN
United States Magistrate Judge